## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | |
|---|---|
| THOMAS R. PEAK, d/b/a Peak Bail Bonds, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Case No. 1:06cv0176 TCM |
| | ) |
| MARK L. RICHARDSON and FRED W. COPELAND, | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court[1] on the parties' cross-motions for summary judgment on the one remaining count, Count Three, of the seven-count complaint. One motion is filed by the remaining defendants, Mark L. Richardson ("Richardson") and Fred W. Copeland ("Copeland"); the other motion is filed by all plaintiffs, Thomas R. Peak, doing business as Peak Bail Bonds; Glenn E. Beazley ("Beazley"); Bobby Martin ("Martin"); and John Montgomery ("Montgomery"). [Docs. 101 and 103, respectively.]

## <u>Background</u>

<u>The Parties.</u>  Martin and Montgomery are licensed as bail bond agents by the Missouri Department of Insurance and have been since 1998 and 1997, respectively. (Defs.' Stip.[2] ¶¶

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

[2]"Stip." refers to a party's stipulation of uncontroverted facts that is not disputed by the other party or is supported by the evidence.

1, 2.)  Beazley is employed by Peak Bail Bonds and supervises Martin and Montgomery.  (<u>Id</u>.

¶ 3.)  Martin and Montgomery have a contract with Peak[3] and Beazley to act as bail bond

agents under the Peak surety.  (Pls.' Stip. ¶ 2; Defs.' Stip. ¶ 7.)

Copeland is the circuit court judge for the 34th Judicial Circuit in Missouri.  (Defs.'

Stip. ¶ 4.)  This circuit includes New Madrid and Pemiscot Counties.  (<u>Id</u>.)  Richardson is the

circuit court judge for the 36th Judicial Circuit in Missouri.  (Richardson Aff. ¶ 1.)  This

circuit includes Butler and Ripley Counties.  (<u>Id</u>.)

<u>Montgomery and the 36th Judicial Circuit.</u>  Montgomery wrote bail bonds in the 36th

Judicial Circuit from July 2003 until February 2004.  (Pls.' Stip. ¶ 6.)  Montgomery's name

was included on a September 23, 2003, list of bond agents approved to write bonds in the

36th Judicial Circuit.  (Pls.' Ex. 9.)  He was identified as having been added to the list as of

September 19, 2003.  (<u>Id</u>.)  This list, addressed to the sheriffs of Butler and Ripley Counties,

was "a **revised list** of approved bail bondsmen for the 36th Judicial Circuit."  (Pls. Ex. 9;

emphasis in original.)  Anyone arrested in the two counties could "<u>**only**</u> be bonded by" one

of the agents listed.  (<u>Id</u>.)

In February 2004, Montgomery attempted to write bonds under the Peak surety and

was informed by Richardson that he was no longer authorized to write bonds in that circuit.[4]

---

[3]The parties refer to Thomas R. Peak and Peak Bail Bonds interchangeably.  If it is unclear which reference is intended, the Court will use "Peak" to refer to either or both.

[4]Prior to 2005, bail bond agents understood that approval was required by the circuit judge in order to write bonds in a circuit.  (Defs.' Stip. ¶ 6.)

(Pls.' Stip. ¶¶ 7,8.) Richardson revoked Montgomery's authority to write bonds in his circuit after receiving information that caused Richardson to believe that Montgomery was not reputable as required by Missouri Supreme Court Rule 33.17.[5] (Pls.' Stip. ¶¶ 12, 13; Richardson Dep. at 5,7; Richardson Aff. ¶ 11.) It is undisputed that Richardson believes that he must find every bond agent to be reputable prior to approving them to write bonds in his circuit. (Pls.' Stip. ¶ 26.) He defines "reputability" as "what would be commonly thought of in general, by the general public as someone who's reputable, someone who is of good character, someone who conducts his personal and professional affairs in the way he would – he would be respected in the community [committee] as a whole." (Pls. Stip. ¶ 61.) (Alteration in original.)

After Richardson took office in January 2003, he was informed by an employee, Judy Vaback, in the clerk's office for the 35th Judicial Circuit that Montgomery "was charged with

---

[5]Rule 33.17 provides, in relevant part:
A person shall not be accepted as a surety on any bail bond unless the person:

(a) Is reputable and at least twenty-one years of age;

. . .

(c) Has not, within the past 15 years, been found guilty of or pleaded guilty or nolo contendere to:

    (1) Any felony of this state, any other state, or the United States; or
    (2) Any other crime of this state, any other state, or the United States involving moral turpitude, whether or not a sentence was imposed; . . . .

Mo.S.Ct.R. 33.17 (alterations added).

taking drugs in exchange for writing bonds." (Id. ¶¶ 14, 16, 30.) Richardson had then understood that the charges against Montgomery had arisen in Dunklin County, part of the 35th Judicial Circuit, and not in his circuit. (Richardson Aff. ¶ 12.) He has since learned that the charges arose in Butler County, which is part of his circuit. (Id.) Montgomery had been charged in 1998 with possessing methamphetamine with the intent to distribute. (Id. Att. D.) In August of that year, Montgomery executed a deferred prosecution agreement, admitting that he had accepted approximately one ounce of methamphetamine in payment of a debt owed on a bail bond. (Id.) The agreement imposed certain requirements on Montgomery and provided that if he failed to comply with these requirements for a three-year period, formal proceedings against him could be initiated. (Id.) Montgomery was not charged with a crime in Dunklin County, nor has he been charged with, investigated for, or questioned about, a crime after 2003. (Pls.' Stip. ¶¶ 32, 33.)

Richardson did not base his decision that Montgomery was "not reputable" on the deferred prosecution agreement.[6] (Richardson Aff. ¶ 12.) Rather, he based his decision on the information he received from Ms. Vaback.[7] (Pls.' Stip. ¶¶ 21, 27-29.) Also, he had no independent knowledge about the charges and did not know whether Montgomery had been convicted. (Pls.' Stip. ¶¶ 21, 35.) Richardson does conduct a criminal background check on

---

[6]Richardson did not invoke Missouri Supreme Court Rule 37.17(c)(1), see note 5, supra, to revoke Montgomery's bond writing privileges. (Pls.' Stip. ¶ 25.)

[7]There is a dispute whether there were any newspaper articles about the criminal charges against Montgomery. There is no dispute, however, that Richardson's decision about Montgomery was not based on any article.

prospective bail bond agents prior to approving them to issue bail bonds in his circuit. (Id. ¶ 35.) No records are kept of these checks. (Id. ¶ 36.)

Richardson did not meet with Montgomery prior to revoking his bond writing privileges. (Pls.' Stip. ¶ 38.) He believes that it was Montgomery's responsibility to contact him to reconsider bond writing privileges after any charges were dropped. (Id. ¶ 23.)

There is a factual dispute about whether Montgomery made any attempt to contact Richardson after his bond writing privileges were revoked. Richardson avers that he was not aware of any effort by Montgomery to contact him and that he heard nothing from Montgomery about Montgomery's revocation status until he (Richardson) received a letter from Montgomery's counsel protesting the action. (Richardson Aff. ¶¶ 15, 16.) On the other hand, Montgomery avers that he attempted to contact Richardson repeatedly after his bond writing privileges were revoked, but Richardson never returned the telephone call. (Montgomery Aff. ¶ 7.) He further avers that Richardson's secretary told him (Montgomery) that the judge did not intend on taking any calls from Montgomery. (Id.) Richardson would consider or reconsider an application by Montgomery to write bonds on an appeal. (Richardson Dep. at 15.)

It is undisputed that Montgomery was not given any notice of (a) any right to (i) a hearing on the revocation of his bail bond writing privileges or (ii) an appeal from the adverse decision; (b) a right to counsel; and (c) any right to confront his accusers regarding the revocation of his bail bond privileges. (Montgomery Aff. ¶¶ 14-17.) It is disputed whether such rights exist.

In early 2005, Peak submitted Montgomery's name for approval as an agent in the 36th Judicial Circuit as part of a packet. (Richardson Dep. at 31.) Peak did not provide any additional information about Montgomery's criminal status. (Id.)

In 2007, Richardson attended judicial training that included information about bail bond procedures in Missouri after 2004 changes. (Id. at 10-11.) At this training, he received a handout titled "Compensated Bond Agent Procedure." (Id. at 11; Pls.' Ex. 11.[8]) The handout provides, in part: "the power to decide who is granted the power of a bond agent has been passed to the executive branch"; "if the court is satisfied the general agent is licensed and has the ability to satisfy a forfeiture, the bond is approved"; and "licensing and qualifications of who is in the bond business is the responsibility of the Department of Insurance." (Pls.' Ex. 11 at 2, 9, 11.) Richardson interprets the 2004 changes to continue to provide that judges retain the authority to make decisions whether a bail bond agent is reputable. (Richardson Dep. at 11.)

Martin and the 36th Judicial Circuit. Martin began writing bail bonds under Peak's authority or surety in late 2004. (Pls.' Stip. ¶ 63.) On March 30, 2006, after being advised by the sheriff of Butler County, Mark Dobbs, that Martin was bribing Butler County inmates for referrals and had placed $20 in an inmate's account, Richardson wrote Martin that his privilege to write bail bonds in the 36th Judicial Circuit was revoked. (Richardson Aff. ¶¶ 18, 19; Defs.' Stip. ¶ 17; Dobbs Dep. at 116.) Richardson believed that, as a result of this

---

[8]The document is referred to by Plaintiffs as Exhibit 10; however, it is marked as Exhibit 11.

conduct, Martin was not reputable as required by Rule 33.17(a).  (Richardson Aff. ¶ 18.)

Richardson also believed that it was a violation of state statue, Mo.Rev.Stat. § 374.717(3),[9]

to pay money for referrals.  (Pls.' Stip. ¶¶ 79-80.)  Martin requested, and was granted a

hearing, at which he "provided a 'plausible' explanation for his placing money on [sic] the

inmate's account."  (Pls.' Stip. ¶ 81.)  Richardson then reinstated Martin's bond writing

privileges.  (Id.)

On June 14, 2006, Richardson again wrote Martin.  (Richardson Aff. ¶ 21; Pls.' Stip.

¶ 20.)  This letter read that "credible information" had been received that Martin "continue[d]

to inappropriately use inmates to recruit business, that John Montgomery is still writing bonds

under your bonding authority; and that you have solicited and received sexual favors in

exchange for your fees."  (Richardson Dep. Ex. 17.)  Richardson advised Martin that he

considered this conduct to be a violation of Rule 37.29(a), see note 5, supra, and that he was

immediately revoking Martin's authority to write bonds in the 36th Judicial Circuit.  (Id.)

Consequently, although Martin has a license to write bail bonds for the State of Missouri, he

has been unable to do so in that circuit since June 2006.  (Pls.' Stip. ¶ 66.)

---

[9]Section 374.717 provides, in relevant part:
No insurer or licensee, court, or law enforcement officer shall:

. . .

(3) Pay a fee or rebate or give anything of value to the principal or anyone on the
principal's behalf; . . .

This second decision by Richardson was based on (1) information he received from Sheriff Dobbs that Martin (a) continued to use inmates to recruit for business, (b) discussed trading sex for bond fees with female inmates, and (c) was writing bail bonds for Montgomery, and (2) the Sheriff's request that Martin's authority to write bonds be suspended. (Defs. Stip. ¶¶ 21-23.) Richardson believed Sheriff Dobbs to be credible and relied on the information he provided. (Id. ¶ 24.) He also considered a May 2006 letter from Amanda Sullivan, who alleged that Martin had offered to post bond for her in exchange for sex. (Id. ¶ 25; Defs.' Mtn. Att. J.)

Martin has never allowed Montgomery to write bail bonds under his authority, nor does he possess such authority. (Pls. Stip. ¶ 68.) Also, Martin denies exchanging bail bond fees for sex. (Martin Aff. ¶ 10.) He does think, however, that it is possible that Sheriff Dobbs, after listening to taped telephone conversations between Martin and female inmates, believed that Martin was discussing sexual acts with female prisoners. (Defs.' Stip. ¶ 28.) Richardson has not listened to those tape recordings, and he has not spoken to any woman who allegedly was solicited by Martin. (Pls. Stip. ¶¶ 87-88.) He also did not speak with Martin before revoking his bond writing privileges. (Id. ¶ 91.) Richardson believes that he could revoke Martin's bond writing privileges based only on the Sheriff's representations. (Id. ¶ 89.)

Martin was not given notice of any right to a hearing or to an appeal, a right to counsel, or a right to confront his accusers regarding the revocation of his bail bond privileges.

(Martin Aff. ¶¶ 12-15.) Richardson does not believe that Martin was entitled to such notice. (Pls.' Stip. ¶ 92.)

Again, there is a dispute about the challenging of Richardson's revocation decision. Martin testified that he attempted to make an appointment with Richardson about the revoked authority to write bail bonds, but "never got it." (Martin Dep. at 105.) On the other hand, Richardson avers that he was unaware of any attempt by Martin to meet with him about the June 2006 decision. (Richardson Aff. ¶ 24.)

Richardson did not provide any of the information regarding the allegation that Martin was trading bond fees for sex to the Missouri Department of Insurance because he did not want to cause Martin problems in other circuits in Missouri. (Pls.' Stip. ¶ 93.)

Martin and the 34th Judicial Circuit. Copeland wrote Martin on September 6, 2006, that Martin's "authority to write bonds or be involved in any bail bonding activity" in the 34th Judicial Circuit was revoked. (Richardson Dep. Ex. 18.) This decision was based on information he had received from law enforcement that Martin "[had] abused his privileges as a bondsman by corroborating with individuals in custody and passing information to others outside of the jail facility, thus interfering with ongoing criminal investigations." (Id.)

The information referred to by Copeland included the following. Copeland had received information from Sergeant Thomas Cooper ("Cooper") with the Missouri Highway Patrol that Martin had been asked by an inmate to "clean up some shit" for the inmate, which Martin had allegedly agreed to do. (Pls.' Stip. ¶ 111.) Cooper also provided information to Copeland that Martin was exchanging bail bonds for sex. (Id. ¶ 109.) Copeland had

previously heard rumors that Martin was exchanging discounted bail bond fees for sex with female inmates, but had never acted on this information because they were only rumors.  (Id. Stip. ¶ 117.)  The current information was not considered by Copeland to be only rumors because there was now a victim who had made a statement and an admission by Martin that he cut his fees in return for sex.  (Copeland Dep. at 9; Defs. Ex. A.)  Copeland received additional information that a Mickey Dunn had spoken with Martin about cleaning drugs out of Dunn's house before the police arrived.  (Pls.' Stip. ¶ 119.)

Copeland believed the information he received from Cooper.  (Id. ¶ 127.)  He concluded that Martin was not reputable based on:  "(1) The Department of Corrections recorded conversations related to him by the highway patrolman, (2) the alleged exchange of sex for bonds, (3) an incident that occurred in another state where Mr. Martin allegedly held himself out as a police officer a couple of years ago, and (4) Judge Richardson's [June 2006] letter revoking Martin's bond writing privileges in the 36th Circuit."  (Id. ¶ 130.)  Copeland determined that Martin's conduct was not reputable as required by Rule 33.17(a).  (Copeland Aff. ¶ 11.)  Copeland conducted no independent investigation into Martin's behavior prior to making a decision to revoke Martin's bail bond privileges.  (Pls. Stip. ¶ 126.)

No prior notice about the revocation of his bond writing privileges was provided to Martin by Copeland.  (Id. ¶ 102.)  Nor was Martin given notice of any right to a hearing to protest the revocation or to an appeal, a right to counsel, or a right to confront his accusers.  (Martin Aff. ¶¶ 11-15.)  Copeland believes that it is Martin's responsibility to initiate proceedings to regain bond writing privileges after those privileges have been revoked.  (Pls.'

Stip. ¶ 142.)  He also believes that the Missouri Department of Insurance does not have the ability to investigate bond agents and that the term "reputable" is defined by the decision-maker.  (Id. ¶¶ 143, 150.)

On January 30, 2007, Plaintiffs filed a Petition for Writ of Mandamus against Copeland and Richardson in the Missouri Supreme Court asserting that they had no authority to revoke a bail bond agent's license.  (Defs.' Ex. B.)  This petition was denied without prejudice two days later.  (Defs.' Ex. G.)  On February 14, a similar petition was filed by Plaintiffs in the Missouri Court of Appeals for the Southern District.  (Defs.' Ex. C.)  This petition was denied on February 26.  (Defs.' Ex. H.)

### Discussion

"Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) (alteration added).  An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor.  See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts.  See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986).  All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party.  See **Ghane v. West**, 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993).  "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit."  **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998).

And, where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate.  See **Adams v. Boy Scouts of America - Chickasaw Council**, 271 F.3d 769, 775 (8th Cir. 2001); **Gordon v. City of Kansas City, Mo.**, 241 F.3d 997, 1002 (8th Cir. 2001).

The issue in the instant case is whether the remaining defendants, both circuit court judges for the State of Missouri, are protected from this suit by the doctrine of judicial immunity.

"'As a class, judges have long enjoyed a comparatively sweeping form of immunity. . . .'"  **Duffy v. Wolle**, 123 F.3d 1026, 1034 (8th Cir. 1997) (quoting Forrester v.

White, 484 U.S. 219, 225 (1988)) (alteration in original).  "This absolute immunity from suit allows judges to fulfill their duties without concern for their fortunes, which helps to ensure that their duties will be performed impartially and completely."  **Id.**  "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages."  **Mireles v. Waco**, 502 U.S. 9, 11 (1991) (per curiam).  Thus, it is not defeated by allegations of bad faith or malice.  **Id.**  "Rather, . . the immunity is overcome in only two sets of circumstances.  First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity.  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction."  **Id.** at 11-12 (alteration added) (internal citations omitted).  "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether the act is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity."  **Stump v. Sparkman**, 435 U.S. 349, 362 (1978) (alteration added).  "In other words, [the Court] look[s] to the particular act's relation to a general function normally performed by a judge . . . ."  **Waco**, 502 U.S. at 13 (alterations added).  When considering the second set of circumstances, "the *complete* absence of all jurisdiction," "'the scope of the judge's jurisdiction must be construed broadly . . . .'"  **Duty v. City of Springdale, Ark.**, 42 F.3d 460, 462 (8th Cir. 1994) (quoting Stump, 435 U.S. at 356) (emphasis added) (alteration added).  "If judicial immunity means anything, it means that a judge 'will not be deprived of immunity because the action he took was in error . . . or was

in excess of his authority.'"  **Waco**, 502 U.S. at 12-13 (quoting <u>Stump</u>, 435 U.S. at 356) (alteration in original).

In the instant case, the two remaining defendants are not immune if the actions taken were (a) not taken in their judicial capacity or (b) taken in the complete absence of all jurisdiction.

Plaintiffs argue that Richardson's and Copeland's revocation decisions were not taken in their judicial capacity because Missouri law places the authority to administer and enforce the provisions of Missouri Revised Statutes §§ 374.695 through 374.789, the Professional Bail Bondsmen and Security Recovery Agent Licensure Act ("the Act"), with the Missouri Department of Insurance ("MDI").  <u>See</u> Mo.Rev.Stat. § 374.705 (giving the MDI authority to, inter alia, regulate bail bond industry and set fees for bail bond agents).  The Act includes, at § 374.715, a description of the application requirements for bail bond agents, including that prospective agents provide proof to the MDI that the applicant "is of good moral character, and meets the qualifications for surety on bail bonds *as provided by supreme court rule*." Mo.Rev.Stat. § 374.715(1) (emphasis added).  Section 374.750 provides for written notice to a rejected applicant of the reasons for refusing a license and of the applicant's right to file a complaint with the administrative hearing commission.  Section 374.763 provides that "[a]ll duly licensed and qualified bail bond agents and general bail bond agents shall be qualified, without further requirement, to write bail upon a surety's liability in all courts of this state *as provided in rules promulgated by the supreme court of Missouri and not by any circuit court rule*."  Mo.Rev.Stat. § 374.763(3) (emphasis added).

As noted above, Rule 37.29 requires that a person be reputable to be a surety on a bail bond. Mo.S.Ct.R. 37.29(a). Missouri Supreme Court "Rules 19 through 36, inclusive, govern the procedure in all courts of [Missouri] having jurisdiction of criminal proceedings." Mo.S.Ct.R. 19.01 (alteration added). These seventeen Rules are promulgated under the authority granted to the Missouri Supreme Court under § 5 of Article V of the Missouri Constitution and "supersede all statutes and court rules inconsistent therewith." Mo.S.Ct.R. 19.02. Missouri Supreme Court procedural rules may, however, be amended or annulled by the legislature "'by a *law limited to the purpose*.'" **Breeden v. Missouri**, 987 S.W.2d 15, 17 (Mo. Ct. App. 1999) (quoting Mo. Const. art.5, § 5). Such a statute "must specifically refer to the rule it is superceding." **Id.** See also **Missouri v. Tate**, 658 S.W.2d 940, 947 (Mo. Ct. App. 1983) ("A statute must specifically refer to a rule in order to amend or annul it."). Lacking such reference, Missouri Supreme Court Rules take precedence over any contradictory statutes. **State ex rel. Kinsky v. Pratte**, 994 S.W.2d 74, 75 (Mo. Ct. App. 1999).

In support of their argument that the regulatory scheme in the Act, including those sections governing the application and revocation procedures for bail bond agents, "trumps" the Missouri Supreme Court Rules, Plaintiffs cite **American Druggists Ins. Co. v. Bogart**, 707 F.2d 1229 (11th Cir. 1983). In that case, a corporate surety challenged an unwritten policy of a federal district court that disqualified sureties from writing bonds in the district if the surety has failed to pay the amount of an estreated bond within a certain period after the

date of estreature.  **Id.** at 1230.  The corporate surety had failed to pay an estreated bond after a defendant had failed to appear.  **Id.**  The surety had obtained an extension of time within which to either pay the bond or surrender the defendant; however, an agent of the surety had not been permitted to write a bond regardless of this extension.  **Id.**  The Eleventh Circuit found that the surety's challenge to the policy on grounds that it conflicted with the federal statutory scheme had merit, noting that Congress had given the Secretary of the Treasury "the power to designate and the power to revoke the authority of [corporate] sureties."  **Id.** at 1232 (alteration added) (interim quotations omitted).  The sureties' "supervision, conduct, and responsibility are left in charge of the administrative officer."  **Id.**  This statutory scheme[10] was consistent with the provisions of the Federal Rules of Criminal Procedure acknowledging that corporate sureties were regulated by statute.  **Id.** at 1231-32.  Thus, there was no overlap between the Federal Rules and the statutory scheme; rather, the inconsistency was between the statutory scheme and the district court's unwritten policy.

In the instant case, as noted above, Missouri Supreme Court Rules take precedence over statutes unless a statute specifically refers to the rule it intends to amend or annul. Although Missouri Revised Statutes §§ 374.715 and 374.705, do, in fact,  refer to Missouri Supreme Court Rules, the reference is not in the context of amending or annulling a rule but is in giving deference to the rules.  Additionally, it is the trial court's duty to enforce Missouri

---

[10]The statutory scheme gave rise to the corporate surety's other, due process challenge to the policy.  See **Id.** at 1235-37.

Supreme Court Rules.  See e.g. **Sitelines, L.L.C. v. Pentstar Corp.**, 213 S.W.3d 703, 707 (Mo. Ct. App. 2007) (holding that it is duty of court to enforce rules of civil procedure).

In addition to a judge's decision to revoke a bail bond agent's authority to write bonds in the judge's circuit being authorized by Missouri Supreme Court Rule and not being inconsistent with the statutory scheme cited by Plaintiffs, such a decision is not inconsistent with Missouri statutes governing criminal procedure.  For instance, Missouri Revised Statutes §§ 544.455.1(3) and (6) provide that a judge may impose bond conditions that include requiring the "execution of a bail bond with sufficient solvent sureties or the deposit of cash in lieu thereof" and may "[i]mpose any other condition deemed necessary to assure appearance as required[.]"  **Id.** (alterations added).

Considering the relevant statutes, the Missouri Supreme Court Rules, and the trial court's obligation to enforce those rules, it becomes apparent that Defendants are permitted, if not required, to determine whether bail bond agents writing bonds in their courts are reputable.  See **Concord Cas. & Sur. Co. v. United States**, 69 F.2d 78, 81 (2nd Cir. 1934) ("If the surety company should so conduct its business as to lose the confidence of the court or a judge thereof, the judge to whom an undertaking is submitted in any case for approval could refuse to approve it. . . .  Like any other financial risk in giving an undertaking or guaranty, a moral risk as well as the material risk is involved.")

For the foregoing reasons, the Court finds that revoking a bail bond agent's privilege to write bail bonds in a judge's court or circuit is a judicial action, *i.e.*, an act taken in the

judge's judicial capacity. <u>See</u> **Waco**, 502 U.S. at 12-13 (noting that when considering question of judicial immunity, it is not the particular act that is to be scrutinized but is that act's relation to a general function normally performed by a judge).[11]

As did the corporate surety in **Bogart**, Plaintiffs also challenge Defendants' failure to provide them a hearing and other procedural protections as a violation of their right to due process.

In **Stump**, a mother's ex parte petition to have a "somewhat retarded" fifteen-year old girl sterilized was approved by an Indiana circuit judge without a hearing, without notice, and

---

[11]In support of their argument to the contrary, Plaintiffs cite **Forrester**, 484 U.S. at 229. The act at issue in that case was the demotion then discharge of a probation officer. That act was found to be taken in the judge's administrative, not judicial, capacity. The Court reasoned that "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions." **Id.**

Plaintiffs' reliance on **Forrester** is unavailing. They are not employed by the court, and, Defendants' decisions, although affecting Plaintiffs' income and employment, relate to bail bonds and bond conditions, decisions that are entrusted to judges in their judicial capacity because of their responsibility for setting conditions to ensure a defendant's appearance in court and ensure the safety of the community. Clearly, the act of revoking a bail bond agent's authority to write bonds in the judge's own circuit based on the judge's determination that the agent fails to comply with Missouri Supreme Court Rules is judicial in nature.

Plaintiffs also **Supreme Court of Virginia v. Consumers Union of the U.S.**, 446 U.S. 719 (1980). In that case, the Supreme Court permitted a declaratory judgment action against the Virginia Supreme Court because that court was acting in their legislative capacity when promulgating and enforcing rules on professional responsibility. **Id.** at 731-32. The Court reasoned that the acts of setting attorney disciplinary rules of general application are statutory in nature and arise out of a need to regulate conduct and not out of a controversy which must be adjudicated. **Id.** at 731. Defendants were not enforcing or promulgating rules for bail bond agents in Missouri's 45 circuits and 114 counties. Instead, they were making decisions on who could write bail bonds in their courts and the boundaries of that decision were consistent with Missouri Supreme Court Rules requiring that sureties be reputable.

without the appointment of a guardian ad litem to represent the girl.  435 U.S. at 351-54.  The

Court concluded that because the judge presided over a court of general jurisdiction, "neither

the procedural errors he may have committed nor the lack of a specific statute authorizing his

approval of the petition in question rendered him liable in damages for the consequences of

his actions."  **Id.** at 359-60.  "Disagreement with the action taken by the judge . . . does not

justify depriving that judge of his immunity[,]" regardless of "the unfairness to litigants that

sometimes results[.]"  **Id.** at 363 (alterations added).  Here, as in **Stump**, the judges have

general jurisdiction.  See **Darrah v. Foster**, 355 S.W.2d 24, 30 (Mo. 1962) (citing Mo. Const.

art. 5, § 14).  Any errors in procedure do not remove the cloak of judicial immunity.

Defendants may also not be immune if they acted in "the complete absence of all

jurisdiction."  **Waco**, 502 U.S. at 12.  As stated above, the scope of the judge's jurisdiction

is broadly construed when considering the issue of judicial immunity.  **Duty**, 42 F.3d at 462.

"An act in excess of jurisdiction will not deprive a judge of immunity."  **Id.** (finding that a

municipal judge was entitled to judicial immunity when he issued a warrant for the plaintiff's

arrest during the pendency of an appeal; although the judge lacked authority to issue the

warrant when an appeal was pending, he did have the general power to issue warrants; thus,

his acts were *in excess* of his jurisdiction and not *in the complete absence* of his jurisdiction).

See also **Stump**, 435 U.S. at 356-57 (an act in excess of jurisdiction does not defeat judicial

immunity).

The clear weight of authority gives Missouri circuit judges jurisdiction to determine whether a particular surety can write bonds in that judge's circuit. A judge's alleged failure to do so without an investigation into the underlying reasons or a judge's failure to give any pre- or post-revocation procedural protections to the revoked agent does not deprive that judge of jurisdiction over bail bond approval or rejection. At worst, Defendants acted in excess of their jurisdiction; and this is insufficient to deprive them of judicial immunity.

### Conclusion

The remaining defendants, Mark L. Richardson and Fred W. Copeland, are entitled to judicial immunity from Plaintiffs' 42 U.S.C. § 1983 claim in Count Three, the only remaining count. Accordingly,

**IT IS HEREBY ORDERED** that the motion of defendants Mark L. Richardson and Fred W. Copeland for summary judgment is **GRANTED**. [Doc. 101]

**IT IS FURTHER ORDERED** that the motion of Plaintiffs for summary judgement is **DENIED**. [Doc. 103]

**IT IS FINALLY ORDERED** that the motion of defendants Mark L. Richardson and Fred W. Copeland to dismiss is **DENIED** as moot. [Doc. 93]

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>19th</u> day of <u>March,</u> 2008.